We are now recording. Hear ye, hear ye. This Honorable Appellate Court for the Second Judicial District is now in session. The Honorable Robert D. McLaren presiding. Your Honors, the second case on the docket this morning is 2-21-0074. The people of the state of Illinois, Plaintiff Appley v. Jonathan Celis, Defendant Appellant. Arguing on behalf of the Appellant, Ms. Erin S. Johnson. Arguing on behalf of the Appellee, Ms. Diane L. Campbell. Thank you. Is it Johnson or Hamilton? Johnson. That's what I thought. I thought he said Hamilton, but maybe I'm wrong. You may proceed, ma'am. Thank you. Thank you. Good morning, Your Honors. Counsel, may it please the court. My name is Erin Johnson with the Office of the State Appellate Defender, and I represent the Defendant Appellant in this case, Mr. Jonathan Celis. The issue in this case is self-defense. On the evening of February 24th, 2018, Jonathan Celis was attacked by four members of the Latin Kings Street Gang in the parking lot of the La Canola Restaurant in Waukegan. During this attack and in self-defense. Because all the evidence presented by the state at trial supported Jonathan's claim of self-defense, his conviction for first-degree murder must be reversed. If I may, who was the defendant protecting at the time of the last confrontation with the knife? Himself, Your Honor. I think it's clear from his testimony that after he's pulled up from the fence area, and I guess jumping forward to that point in time, he was being punched by Oscar Castaneda and Giovanni Diaz in the fence area in front of the restaurant. He falls backwards through the fence. He's picked up by a group of other people. You know, while he's still dizzy and disoriented, and he testified he was dizzy. You can see on the video that there is a bit of stumbling when he's picked up from the fence. He sees Oscar Castaneda coming back in his direction. I'll be it. And obviously the state's going to hammer this. When you pause the video, his back is turned, but he is coming back in the direction of the group with his hands over his head. And the video corroborates Jonathan's account that he was yelling threat. It does appear that Oscar Castaneda is back towards the group and he is making gestures over. How can you be sure that he's yelling at the defendant? I mean, there are there are at least 10 to 15 people out there yelling, throwing gang signs. There are young ladies involved. And by the time he gets pulled away from the fence, he is actually what you might consider like in a fenced in by three other gentlemen and they're off to the side. And Mr. Castaneda, the victim is nowhere near that particular group. So who is how is that a self-defense? Well, I think what you have to look at, Your Honor, as the circumstances that surround it and what Jonathan can perceive, because I think what's important is the video here corroborates Jonathan's account in that we can see him being But what the video can't show us, you know, the video is a bird's eye view. And I'd also point out the state used a frame by frame. But Mr. Castaneda can't see a frame by frame. He's hunched drunk. His face is bloody. He's being held up by these people. And he testified at trial. At first, he didn't know who was grabbing him from the fence. He sees Castaneda coming back in his direction. We don't. Your question was, how do we know he was yelling at Mr. Solis? How does Mr. Solis know he's not? I mean, that's the problem is what can Mr. Solis perceive? And again, at this point, during this less than three minutes of this entire fight, there's been multiple times where Mr. Solis is being punched by one member of the group. You know, first, he's punched by Roberto Mar and Christian Morales, then they turn their attention to someone else, he's out of he's out of being punched for a moment. And the woman in the red jacket comes along and starts punching him in the back of the head, directs Mr. Diaz to start punching him. Mr. Diaz does start punching him, punches him back towards the fence. Then Castaneda comes up behind him while Diaz is punching him in the front and punches in the back of the head. So there's been a few times during this three minute span, where Jonathan has been punched, it stops and the group starts up again. So he has no reason not to think as Castaneda is coming back towards him, that he might be coming back to start punching me again, because this has happened a couple of times in the last three minutes. But at the time, but at the time that he is seeing, assuming he does see Castaneda coming at him, he is surrounded by at least two gentlemen who identify themselves as his brothers. Afterwards, when they're sitting on the side on a on a curb and talking, how, how, because how does he not recognize his brothers holding him? Well, as he said, he was dizzy and disorientated after coming up from the fence. And even with the people around him, he's not by any means safe, Your Honor. I mean, when he first gets punched, he has a girlfriend and several friends around him. Someone else in the very beginning of the video tries to defend him, that person gets attacked. Security comes out, I would note very early in the fight, security is out there by 15 minutes 59 seconds and 1559 40 on the video. And security was by the fence area. And Aubrey Coleman, the security guard testified that he saw Jonathan and Jonathan said his face was all bloody. And Jonathan said, I've been jumped and security guard said, we have to figure out what's going on here. And then the fight got Yes, but we know that Mr. Kennedy, according to the evidence, Mr. Castaneda initiated the physical contact between him and the defense. There was an ongoing melee, as you've alluded to. However, didn't the defendant acknowledged to Detective Capoletti, that when he stabbed Mr. Castaneda, Mr. Castaneda was retreating. He was not coming toward him. He didn't ever acknowledge that he was retreating, Your Honor. That was never stated by Mr. Solis. Jonathan never made any statement he was retreating. He had said that he stabbed him in fear for himself and possibly his girlfriend. And I think that that's borne out by the fact that, as I said, everyone, people have been attacked and reattacked in this brief span of time. And also, I'd point out that, again, to Justice Hutchinson's question, you know, can the important thing is what does Jonathan reasonably what can he perceive? And again, he can't necessarily see that Oscar's Castaneda's back is turned. He sees his figure coming towards him. Again, his face is bloody. He's dizzy. And there's nothing in the evidence that, you know, like I said, Aubrey Coleman supports the idea that Jonathan's face was completely bloody when he's by the fence. Didn't the evidence also establish there was a break, about a 30 second break in the action between the defendants in the group and the victim? I would. I mean, I would dispute that. There was a pause before Mr. The defendant stabbed Mr. Castaneda, was there not? There was a pause between when he's pulled up from the fence and when he stabbed Mr. Castaneda. But my my argument is that there's no indication that the fight is over. No one's dispersing. Again, the video supports Jonathan's account that Castaneda was still yelling threats. He is clearly as he's coming back in that direction, making signs over his head, bouncing up and down. It's completely consistent with the idea that he's making gang signs and yelling threats. There's no there's nothing in this evidence, despite what the state might want to push this. We can't artificially divorce the exact second from the state of the stabbing from the 50 seconds that preceded it, where Castaneda was punching the defendant. And then now he's coming back in the same direction. Was there any evidence that Mr. Castaneda ever brandished or possessed a weapon at any time? There's no evidence one way or another about that, Your Honor. We I mean, again, I would point out that there's been some allegations that no one else was armed. We don't know that. We don't have any. Did the defendant ever indicate he was in mortal fear because he thought he thought or he saw that Mr. Castaneda had a weapon? Was that ever raised in the defense evidence? Not Mr. Castaneda, Your Honor, but the girl, his girlfriend did tell, did yell during the beginning of the fight that Roberto Amaro had a knife. So Jonathan was informed by his girlfriend that someone had a knife, which is important because it goes to his state of mind. Additionally, Jonathan had expressed a concern that maybe someone had a gun. But I think the important thing is whether or not anyone had a knife doesn't really matter for this, because what's happening up to the point of the stabbing is that Jonathan's being beaten by these men. He's been punched in the head multiple times. He's bleeding. He's dizzy. He and again, and he does testify, and this was stipulated to that he had an injury to his wrist. He couldn't use his left wrist. It was in a bandage and it had stitches. So he pulled out the knife to defend himself because he felt that he had no other way of defending himself from these requirements that you can only use a knife if someone else has a knife. Well, that's true. So if I can call out the essence of your argument, you're saying we should not limit our consideration of legitimate self-defense to simply the actions of Castaneda. If other people, if he's acting in concert with the other people there, those actions also have to be considered. Is that what you're saying? Yes, because it goes to what Jonathan would have understood at that moment, because that group that Castaneda is a part of has repeatedly attacked him over the three minutes. But I think even if you look at the immediate 50 seconds preceding the stabbing, Castaneda was punching Jonathan in the back of the head, pushing him through a fence. And so I mean, and then we have to come back towards him. So I think it's both, Your Honor. I think we can look at the fact that it's very clear that Oscar Castaneda attacked Jonathan from behind while he was being punched from the front by another one of the gang members. And it's clear that Castaneda was coming back in his direction. And like I said, the video, while it doesn't have audio, it does support Jonathan's assertion that he was still yelling threats, which does go to Jonathan's frame of mind when he thinks, hey, I'm still under threat of being attacked here. And that's why he acts in reasonable self-defense when he stabs Oscar Castaneda. But I do think it's important, and this goes to some of the questions asked by Justice Hutchinson, when you look at the fact that there was a fight that started and you know, we don't, Jonathan can't necessarily know that Castaneda is not coming back for him because all the people in this group have attacked him multiple times, even when he thinks it's stopping. Ms. Johnson, Castaneda is walking away with his girlfriend and they are hand in hand. Now I'm not saying his girlfriend was an angel during this process because she was as well, but they were walking away. He had to take at least, I didn't count them specifically, but he had to take at least probably eight to 10 steps and running steps. So it's not like he's got his heel to toe, heel to toe, heel to toe. He is running after them as they are walking away. How can that be self-defense? Your Honor, respectfully, I don't think it's that they're walking away. They're still, I mean, again, yes, you're right. They're in the parking lot, but there's a car right there. There are people running around and he had to run after them. He only, again, Your Honor, I would dispute the fact that he ran, he does take a few lunging steps towards Mr. Castaneda. He does lunge towards him. I would characterize it that way. But again, Castaneda was moving back his direction. Like I said, you can see that Castaneda is making signs above his head as he's coming back that direction. And so I guess my point is, is that there's nothing, there was no testimony by any witness that Oscar and his girlfriend were like, okay, let's leave. We're done with this fight. There's no clear breaking point. Let's try and pin that down because Justice Hutchinson's question is important. You seem to be saying, looking at the same video we've all seen, that when Mr. Castaneda was stabbed by the defendant, he was coming toward defendant when he was stabbed. That's not true. I'm saying he's coming in the direction of the group. I'm not saying he was towards them, but I'm saying if you have, this is the group that Jonathan was in. This is the fence. Oscar comes this direction from the fence towards their direction. And so Jonathan's testimony that he saw him coming back in their direction and he was yelling threats is corroborated. Now, again, there's a bigger space and his back is turned, but I think it's important to note what can Jonathan perceive because he's punch drunk, his face is bloody. He's been attacked multiple times because it all comes down to, again, like I said, the video is helpful. The video corroborates all the major elements of Jonathan's account. But I would caution your honors that the video is not the same as being on the ground. The people on the ground don't have a bird's eye view. They can't view this in frame by frame. They can't pause and see where everyone's at that moment is that he's been repeatedly attacked by this group and this man specifically within the last minute. Well, was he being attacked by Castaneda when he stabbed him? No, he was not. Okay. He was not, but he testified that he felt that he might be coming back to attack him again. And that's what's important. Sorry, go ahead. What point does the defendant, if there's a break in the action, the victim is not coming toward the defendant. Is the defendant's belief that he's in mortal danger go on for 10, 15 minutes afterwards? I mean, when does that end? Well, I'd argue it's a case by case basis, your honor. We have to look at the facts of each case. But when we talk about the facts of this case, I highlight the fact that it's been less than 50 seconds from Castaneda first punching the defendant in the back of the head to when he stabs him. So it's well under a minute from when Castaneda first punches him to when he stabs him. That's not an incredibly long time. I think, as I said, the video perhaps is a great tool, but it's not, it doesn't feel the same way as people on the ground because we can look at it just passionately from a bird's eye view and say, oh, look, his body's turned this way. That's not a threat. But the important thing for this court to consider is what was in Jonathan Solis's mind after he's been attacked repeatedly. He's dizzy from being punched. His face is bloodied. And he sees this figure coming back his direction. He testified credibly that he still felt he was under threat from Castaneda. And as I said, it's less than 50 seconds. But your honor, let me ask one last question about this so that you can move on to your next argument. If there's time, one of the elements of self defense is that the defendant had to feel that the danger of harm was imminent. And you've talked about what he saw coming at him and what he did. But isn't it a fact that in order to stab him, he literally had to grab him with one arm, the arm that wasn't doing so well, and turn him around to the side at a minimum. So doesn't that indicate that he was in the he was going in the other direction. He had to turn him around to stab him. Well, I think your honor, my perception of the way the video looks as he reaches out and jabs him and then Castaneda moves and Jonathan stabs him again. And that's the point where he grabs him. But your honor, again, I still believe my argument would still be that given the circumstances, given that Jonathan had been repeatedly attacked, given that he's coming back in his direction, the state did not and the important thing here is the state's required to prove beyond a reasonable doubt that Jonathan's use of force in self defense was not justified. And on these facts, given that the video is consistent with Jonathan's account, given that he testified credibly that he was punch drunk and bloody and dizzy. I believe that that was not proven beyond a reasonable doubt that his force not justified. And I see that my time's up. So I would just say that for this reason, I'd ask that this court reverses conviction for a screen murder because he acts in self-defense. Alternatively, if this court believes that his belief in the need for self defense was unreasonable, then that goes to our second argument, which is that his conviction, if it was unreasonable belief in self-defense, the other circumstances still stand and his conviction should be reversed or should be reduced to second degree murder. And then again, alternatively, as we've said in our brief, if this court is so inclined, this case should be remanded for a new trial based on the lack of proper jury instructions. Thank you. Any other questions? I have a question or two. We're supposed to be reviewing the jury verdict, are we not? Yes, your honor. And the burden of proof is whether a rational trier of fact could conclude that self-defense wasn't available. Is that correct? Right. Whether rational fact could have found that the state didn't prove beyond a reasonable doubt that the force was justified. You said that the defendant was credible. Yes. If not? Yes, your honor. Well, when he was first confronted by the police officer, did he not deny that he stabbed the deceased? He did in the parking lot deny involvement initially. And then the night when he's taking the police station, he admits to his involvement. Uh, at the time he denied the, uh, assault or the murder, uh, could a rational trier of fact decide that his deceit was evidence of guilt? Your honor, that's one you can use. Um, I guess you can say that, uh, um, false, a sculptor statement is probative of consciousness of guilt, but it's so it's not determinative. I think that's a fact that the state likes to highlight a lot and it's one fact, but it's not determinative by any means. I didn't say it was determinative. I suggested to you that couldn't a jury take that into account in assessing the defendant's credibility. I, your honor, I would respectfully say that a rational trier of fact consider that, but I don't think that any rational trier of fact could say that that one statement and the parking lot denying involvement because you're scared negates the entire video, which completely supports the elements of being attacked, being punched. What is he afraid of? The, uh, decedent is no longer a threat. So what is he afraid of? I mean, I can't speak to that your honor, because I was not in those shoes or maybe I would be, I would be very scared if I had just have someone myself, your honor. I mean, whether or not the killing was justified someone, I mean, had never obviously killed someone before. He'd never been in a, he doesn't have, um, criminal history. So it's reasonable to believe that he would be very nervous by this whole situation and scared for what's going to happen next. Um, but I don't, and again, I, I, it's a bad fact, but it's not one that negates everything in the video that cor, that corroborates his account. And so I think even a rational trier of fact can't take that one denial and erase all the indicate the state didn't prove beyond a reasonable doubt that the force wasn't justified. And that's the burden here. Picking up on Justice McLaren's point at the moment that Mr. Selis stabbed Mr. Castaneda, what was he defending himself against at that moment? A further attack by Mr. Castaneda. Mr. Castaneda was coming toward him. He had a weapon. He was, what was he doing when he was stabbed? He was yelling threats and making game signs over his head when he came in that direction. So he was walking away with his girlfriend. Was he not your honor? That's one interpretation of the video. But again, I wouldn't, I wouldn't caution the court that this video has been paused frame by frame by the state. That's not what the people on the ground can see. He was coming back in the direction of the group. Mr. Cast Mr. Selis was in Castaneda was coming back in the direction of his group. He was making gang signs over his head. That can be seen on the video. Let's assume that's true. You're asking us to find that if he's coming back in the direction, doesn't have a weapon, he's yelling gang signs that gives the defendant the right to stab and kill him at that moment. Is that what you're telling us to find? No, your honor. I'm saying that because he was, according to Jonathan, he was yelling threats, which I think is corroborated by what you can see on the video without audio and the gang sign. And because he's just attacked Jonathan, that Jonathan was reasonable to believe that he was about to be attacked again. Would you, would you concede though, at the moment that the defendant stabbed Mr. Castaneda, he was not physically threatening him in any manner. Physically threatening him, yelling. He wasn't touching him, your honor, but he is yelling threats. So, you know, we don't know what he was about to do next. Just because his body happened to be turned one way towards the other at that moment, there's no guarantees he wasn't about to turn back and fight again. Because that would justify stabbing and killing him because of what he might've done. Yes. And I think the case well, bears that out because there's cases where someone is approaching a defendant, yelling and defendant shoots and kills them. They're not up on them. You don't have to be physically touching someone. I think the case that we've cited in our brief, um, that is very helpful. Uh, People Be White talks about the fact that the right for self-defense arises before first blood is drawn. You don't have to wait for someone to, and again, here, Castaneda has already hit him. He's already bloodied his face. Why would it be the law? It's not the law that he has to wait for him to start hitting him again. If he thinks he's about to start hitting him again, the need for self-defense has already arisen. It arises. And here it's not even before first blood is drawn. We're saying it's before second blood is drawn because Mr. Castaneda has already drawn blood on the defendant. Now the defendant thinks he's coming back. So given that he was justified in using self-defense. I don't quite understand how someone hitting someone from behind would necessarily cause bloody, a bloody face. Was anybody else hitting the defendant or just Mr. Castaneda? Well, uh, at the time Castaneda first starts hitting, uh, Jonathan, he's hitting him in the back of the head while his associate, Mr. Diaz is punching him in the front of the head. But it's a little bit unclear because then they both are hitting him at the same time and he goes backwards through the fence. So was the bloody face caused by both of them? You know, one of them, the fence, it's not clear, but it was caused by their beating. And, um, is this the noble review? Yes. You, you have the ability to look at the facts and see if you believe that, uh, self-defense was, I guess the standard, the standard of review here is whether any rational trier fact could have found that the force was not justified as to self-defense. That's the standard. So if you'll have an opportunity to make rebuttal, um, as Campbell, you may proceed. Thank you, your honor. Um, a couple points. Um, you are correct that, um, the bloody face of the defendant, which can be seen in officer Paulson's body cam. Um, it's not a completely bloody face, although there are traces of blood, um, a marrow hit defendant in the face in the first, uh, confrontation. And then, um, uh, as I think you pointed out, um, uh, Mr. Salis is hitting the defendant in the back of the head while DS hit him in the face. So, you know, it's not, uh, Mr. Salis, Mr. Salis, sorry. I'm sorry. Um, and, uh, as to whether, um, uh, one other thing I'd like to go to is that, um, opposing counsel and your honors have questioned, you know, whether we can segment and whether, um, I believe opposing counsel said I'm artificially separating the events. And, um, in my bright, in my brief, I cite to, um, the Ingram case, um, that's at page 30. And in that case, um, the court does separate the actions to the moment of the stabbing. Um, in that case, um, the defendant had been outside of the apartment. She was staying, um, at the victim's house for a couple of weeks. Um, but it was the victim's apartment. Um, while she's outside the apartment, a friend tells her that, um, the, uh, about, um, not letting her stay in his apartment anymore. Um, he denies her entry. Um, they put Latasha up and the defendant opened the door to the Latasha. Um, the defendant and Mr. Booker push past and into the apartment. Um, the victim grabs a baseball bat and takes a swing to try and them out of his apartment and Booker and Mr. or the victim are struggling over the bat. At that point, the defendant takes a one foot serrated knife and begins to stab the victim in the back. And the, um, appellate court found that at that time, um, her, uh, actions were, uh, inappropriate. Um, at that time, the defendant or the victim was struggling with the bat with Mr. Booker. He was not, um, struggling with her or threatening her in any manner. So the court there separated the actions, you know, as to time and who was threatening whom at the time that the stabbing occurred. Campbell, can you clarify a point? There's been a great deal of debate and what Mr. Castaneda was doing and not doing at the moment he was stabbed. Um, was Mr. Celis interviewed by Detective Capaletti? Did he give any indication as to what Mr. Castaneda was doing when he stabbed him? Did he indicate that he was moving away or retreating? Did he make any admissions about that? Um, what he's, I believe my, my, my memory is that what he told Capaletti is that, um, he was afraid at the time and that's why he stabbed him. Um, but, uh, and I believe that was also his trial testimony, but, um, obviously the jury, you know, the jury not only had the video, but they had the opportunity to hear the testimony of both and his girlfriend and assess their credibility, which, you know, is far superior to what we have. Obviously the jury did not find the defendant credible because they convicted him of first degree murder, rejecting both, uh, self-defense and unreasonable self-defense. Um, in this case, I think as your honors have pointed out, um, at the time of the final confrontation and fatal stabbing, the defendant is in a little huddle with some of his friends. Um, the defense counsel said, you know, he's woozy and everything, but, you know, he does appear to like lean over a little, but he may just be tired and catching his breath. Um, you know, it is after closing at the bar anyways, but he is, you know, with in a little huddle with several of his, um, supportive, uh, companions who are not attacking him. And at that point, um, the victim comes out of the fenced area. Um, he is, we, as, uh, opposing counsel noted, there's no audio. So we don't know if the, uh, Mr. Castanedo is yelling at the defendant, if he's making threats, he could as well be saying, you know, leave us away, leave us alone, go away. He is waving his hand in the air. So you can see he is not armed in any manner. He veers away from the defendant. And if the, you know, in this case, you know, if he was making or yelling threats of the defendant, why would he then turn his back on the defendant? Because, you know, as your honors noticed, he had to run several steps to catch up with the defendant who is moving away from him. He has his back to him. He has to actually reach around the defendant to stab him in the front. And then the defendant like turns and he gets the second stab. So at the time that, um, the defendant stabbed him, um, he was not preventing presenting any threats to the defendant. At that point, he was moving away from him. He wasn't armed. Um, the defendant had been in the huddle with his, you know, associates who were not attacking him. So, um, Ms. Campbell, how would you respond to Ms. appears to be Ms. Johnson's overarching argument that you just can't consider what happened at the moment that Mr. Castaneda was stabbed. There's an ongoing nearly, you've got to consider the entire context, the entire fight, if you will, and its impact on the defendant's reasonable fear. How do you respond to that? I would say that, um, certainly Ingram would disagree with that. Um, you can segment, you know, to the moment of the actual stabbing and attack, but overall, um, the defendant, um, is the only one with a knife. Um, the, in the defendant's statements to Capiletti right afterwards, you know, he doesn't, um, and I review this on, in my brief at, uh, page eight and page 18, um, defendant told the police that if he didn't use the knife, um, he was afraid. Um, it is somebody else who has thrown the first punch. Um, the defendant did not tell detective Capiletti that night that any of the other men had knives. He didn't mention knives when Capiletti remarked who knew what happened. If defendant didn't have a knife, he didn't correct Capiletti when Capiletti said the others didn't have knives. Um, instead he told Capiletti that he was scared they were going to pull out a gun. Um, I think your officers, your, one of your, one of the justices noted that, um, at the scene when he's questioned by officer Paulson, the defendant denies that he had the knife and said he didn't stab anyone. Um, again, that's at my brief at eight and nine and 19. Um, the defendant, um, clearly, you know, in, okay. Um, the statute requires that at the time of the killing and the justified self-defense twice uses the word imminent. So I think at this point we do look at the actual events at the time that the defendant chose to pursue the, the victim who is going away from him and with his back turned, you know, it takes several steps to catch up with him. He has to reach the defendant's back or the victim's back is to him. So he has to reach around in order to stab him. So, you know, I think in this case, um, given the fact that there was, you know, the short period of, you know, inactivity where he is in a safe zone and not being attacked. And we don't in fact know that the, the victim was shouting threats at him. That is the defendant's statement at trial. Um, and obviously the jury did not believe that. And here with the victim has to be brandishing some type of a weapon in order to justify self-defense. Um, there are a number of cases. Um, Austin also had some other language, um, uh, passion on the part of the slayer, uh, no matter how violent will not relieve the defendant from liability for murder, unless it is engendered by provocation with the law recognizes as being reasonable and adequate. If provocation is insufficient, the crime is murder. That's at 125, um, mutual combat or, or fight or struggle, which parties, uh, interwillingly or where two persons upon a sudden quarrel mutually fight upon equal terms and where death results from the combat. That's also at one 25. Um, are you saying then that the victim would have to be armed? Um, no, no, but in this case, you have to look, um, at a number of the cases that both of And in this case, um, the defendant, um, actually stabs four people in the course of the evening. He's the only one, you know, swinging the knife. Um, everybody else, you know, it's a, it's a fisticuffs. Um, so I think in this case where the victim is moving away from the defendant, um, he, his hands are in the air. So you can see he is not in any way armed. So if he's moving away, why does the defendant have to defend himself? And he said at that point, he was defending himself from the person who is unarmed and moving away from him. Instead, you know, he pursues a person who is leaving the area of conflict and no longer a threat to him. How many people were on the detainee side? Um, it is, uh, I believe there are four people named, um, Diaz, um, Amaro, um, in the jury instructions. Um, there are three or four defendants whose criminal histories are introduced, um, who are apparently gang members. So, um, presumably those would be, um, the woman in the red jacket obviously would be, um, so there are several, um, but the defendant also, or the defendant also has several allies. Someone, you know, hits someone and runs into the street and there's a general pursuit of that gentleman by various members, um, for his intervention on the defendant's behalf. Um, clearly the, the small group, when they pause in the action, um, there's two or three gentlemen and I think the alleged battery, um, that would be Mr. Amaro. Um, they come out of the bar and the defendant is with two ladies, one of whom is his girlfriend. Um, and someone comes up, says something to the defendant. Um, one of the ladies steps between them. The Mr. Amaro then dodges around that lady and punches the defendant in the face. I thought that, uh, the, uh, the story started or that the incident started because the defendant touched a woman's derriere. Am I right or wrong? There was an allegation. Um, it was never really proven up at trial, but one of the initial allegations was that the defendant was accused of, um, touching somebody's derriere who may or may not have been the lady in the red jacket. Um, that was about 10 o'clock, um, in the evening, I believe. And, um, the incidents, um, occurred when the bar closed, which I think is like closer to one o'clock in the morning or something. So there's a significant time gap between what may have been, you know, an initial trigger and it's never, you know, shown or demonstrated that it was actually the defendant who may or may not have touched somebody else's butt. So. Okay. Thanks. Doesn't the, the, all right, I'm going to talk about the jury instruction here a little bit, uh, because counsel did swing by it at the end. There are several, I guess, four basic situations when, um, we can use this particular instruction, but the one I think that that issue here would be, um, the statutory language says at the time of the killing, which I think also, um, goes to the issue of how you look at this, that there is a time here, there's a time here, there's a time here and at the time of the killing. So you do have to take this activity apart, even though you're not looking at it on a, on a video as we have done, but at the time of the killing, the defendant is acting under a sudden and intense passion resulting from a serious provocation by the individual killed. He's got serious provocation by a lot of people, but really if, even if now the time gets even broader, if, if this is the actual time we have to look at, because he hasn't been hit by Castaneda now in some time, not just from the time that they're separated and he's surrounded by his three brothers or associates, as you call them, but the hit at the fence is even farther away from the killing. So why, I mean, was the judge correct in not giving that particular instruction? Um, I have a couple points on that. First, the justified use of force uses the word imminent twice. I mentioned that in my brief. And as regarding the provocation instruction, it is the trial court's discretion whether or not to give an instruction. And in this case, I actually looked up and first of all, I'd like to point out in Austin, which is Illinois Supreme Court case, the court held that evidence the defendant relies on must rise above the level of mere factual reference or witness comment for otherwise defendant could force the trial court to include unlimited instructions, which are not related to the case. And that's Austin at 125. And then here in the jury instruction conference, when the trial court refuses to give the provocation instruction, the trial court notes that the evidence must rise to more than mere factual reference, similar to the Austin, although I think the judge cited a different case. The judge then reviews the defendant's testimony, and he was acting by his actions in self defense, I have not heard anything regarding the defendant stabbing Mr. Castaneda, because he was acting under a sudden and intense passion. And then also in slaughter, which I cite in my brief at 31 to 32. The court gave the unreasonable self defense, but refused to give the provocation instruction. There the defendant consistently testified that his actions were defensive, and moted by fear and desire to escape. The appellate court found in short, defendant was motivated by fear and claim to have acted in self defense, rather than motivated by sudden and intense passion due to serious provocation. Accordingly, trial courts decision not to give you the instruction on provocation was proper. And that at 1110. So 1110. Does that answer your question? Yes, thank you. My time is up to your honors. Have any other questions for me? Any other questions? I do not. I don't have any other questions either. Thank you. Thank you, your honors. Johnson, you may proceed with your rebuttal. Yes, your honor, I'd like to start with, you know, Ms. Campbell keeps talking about at the time of the killing at the time of the killing and Justice Hutchinson asked about that. Contrary to the state's repeated assertions, the time of the killing was right after Castaneda had punched Jonathan repeatedly until he fell through a fence. And this is 50 seconds from the from the minute I'm starting the clock at when Castaneda first makes contact with Jonathan, it's 50 seconds from that minute, or from that time to when he stabs him. That's not a long time. That's, you know, definitely at the time of the killing that's still in the moment. But even if we accept the state's idea that there's somehow no more threat because Castaneda is not facing Jonathan at the time of the stabbing. That still is second degree murder here. I mean, this is right after Jonathan has been punched, he's fallen through a fence, he's dizzy, still dizzy from the punches, he sees Castaneda moving his direction, yelling threats, certainly given these circumstances, he believes his use of force was necessary to prevent bodily harm to himself, even if that belief was unreasonable. So even if this court accepts the idea that it was not reasonable for him to think that he was still under threat, which I again, would argue the facts have shown otherwise, because he's been attacked multiple times. But even if we say, okay, you know what, you're not under threat from Castaneda anymore, he's walking away. Jonathan had a reasonable belief when he's moving back towards him. So Jonathan, or Jonathan, not reasonable, he truly believed that he had to defend himself. And that was shown by his testimony and by the video. So if that belief is unreasonable, that's second degree murder. So if we think there's unreasonable self defense here, there still clearly is a preponderance of the evidence that his that he believed he needed to use self defense, even if that was unreasonable. And that's the standard here. Did he prove by did Jonathan prove by preponderance of evidence that he had an unreasonable belief in the need for self defense? And certainly he did. Alternately, I would argue that he proved by preponderance of evidence that this was a secondary murder based on serious provocation. The slaughter case that counsel cited says that secondary murder based on provocation, it's been described as an act of passion or a sudden act of revenge. And that's at 84 LF third 110. How is this not a sudden act of revenge? If we don't think this was self defense, this is 50 seconds after this man punches him through a fence, he stabs him. That certainly is a sudden act of revenge. There was a serious physical assault here by Castaneda on Mr. on Jonathan. So this does fit the definition for second degree murder and to Justice Hutchinson's question, you know, was the instruction necessary? The case law says there just needs to be some evidence to justify an instruction. There was certainly some evidence here of a serious physical assault by Castaneda on Mr. Solis, this instruction was definitely justified under the law. And I wasn't, but the defendant was being either helped to stand, which is your I think, version of the, the three gentlemen standing around him that he was dizzy, so he needed to be helped to stand or he was being protected, which could be another reasonable look at that particular situation where three really kind of big guys are standing around him. And Mr. Castaneda is kind of coming at him, or they're just holding on to him because he's mad. I mean, he broke away from those three people, or maybe you'd say they launched him I, you know, it's also questionable, but he broke away from those three people holding on to him to exact this revenge. How does that fit this description, this this statutory descriptions of what sudden and in what is it sudden and intense passion happened? Because he's just been beaten multiple times by the members of this group. And then why doesn't he stay in the protection of those three men? Your Honor, I guess the question is, but the question isn't what I'm arguing is this is no crime. I mean, obviously, if we if you're if we're accepting the version that secondary murder is a mitigating factor based on the recognition that people act in hot blood, right? So if he 50 seconds after he's been beaten and pushed through a fence, he sees the man who is beaten him coming back towards him, and he stabs him. That's certainly as the case law would have it, active passion or a sudden act of revenge, that someone acting, you know, in hot blood, after a serious physical assault, that's, I mean, I don't know how I just because it wasn't necessary for him to stab someone. I mean, your question about the people around him really goes more to the self defense, which, again, I would argue if you think that the self defense was there was no first degree murder here. Either Jonathan was acting in justified self defense, as I've argued, or he was acting with either unreasonable self defense, or as an act of revenge. But either way, 50 seconds after he's being punched by Castaneda, he stabs him. And that is on either either under either circumstance that meets the definition for second degree murder. So if this court doesn't reverse his conviction for extreme murder, it certainly should reduce it to second degree murder. Alternately, I'd argue that the trial court erred in not giving that second degree murder based on serious provocation. And, you know, Miss Campbell talked about the trial court justification, but as the state admits in its brief, the trust, the trial court was wrong that you can't give both instructions, you certainly can and the defendant is entitled to get any instruction for which there's some evidence. So the court based on Ford, which is cited in the brief, could give both instructions, and it should have and because it didn't, this case should be reversed or remanded for new trial that's not either vacated the conviction or reduced. Thank you. Any questions? I believe Miss Campbell pointed out that she cited to a place where the judge indicated that he didn't hear anything about provocation. And if there was nothing said about provocation, then it's possible that the provocation might have been contained in the video. But what do you believe was the provocation that would substitute or require substitute the unreasonable self-defense claim and result in giving a provocation instruction? You've said things, but you haven't really given us factual scenarios or a contextual argument with facts. You just say it's erroneous. So I'm, asking you, what do you believe was done at the time of the killing, especially that would have been deemed to be provocation? I think that your honor, Oscar Castaneda punching the defendant in the head along with Mr. Diaz until he's pushed backwards through a fence, which is seen on the video, is provocation. The case law talks about a serious physical assault that someone commits a murder in response to a serious physical assault. On that video, you see Jonathan Solis seriously physically assaulted by Oscar Castaneda. So that's the evidence. And even, and as I put it on my brief, to the extent that Jonathan punches back in some of these circumstances, that's still mutual combat. Both of those are covered under the second degree murder statute. So the video itself justifies the instruction because anyone watching that video can see that there was a serious physical assault. And the serious physical assault was also corroborated by the fact that the state's witnesses talked about the state's witness who saw him during the fight that his face was bloody. So there's more than some evidence that he was seriously physically assaulted by Castaneda in order to justify an instruction to second degree murder. As I understand your argument, tell me if I'm wrong, please, that if the victim is the initial aggressor, then upon request, and possibly the court has a duty based upon, despite the request, that there be an instruction about second degree murder. Is that your argument? I think it depends on the facts, Your Honor. I'm saying in these facts, there need to be some evidence that Jonathan was responding to a serious physical assault or mutual combat. And I'm saying that the video introduced by the state gave evidence of a serious physical assault such that their instruction was required. I can't make a blanket statement that anytime there's initial aggressor because obviously there's lots of circumstances, but in this case, the instruction was justified. You mentioned the word revenge. Did you not? Did I mishear you? That was a quote from the slaughter case in defining secondary murder as an act of passion or a sudden act of revenge. At the time or at about the time that the defendant went towards the victim, were the bouncers outside? Yes, Your Honor. My recollection is that Mr. Coleman said something to the effect that he didn't really see the knife until he saw blood dripping on it or something like that. That's correct, Your Honor. Where was the bouncer in relation to the defendant before he went after Mr. Castaneda? Based on my review of the video, and I guess I'd have to watch it again maybe and pay attention for Mr. Coleman, but when Oscar and Giovanni Diaz are punching Jonathan Solis by the fence, security gets up to the fence. That's when Aubrey Coleman says that he sees the defendant, Jonathan Solis, and he sees that his face is all bloody. Jonathan says to him, I've been jumped. Aubrey Coleman testified that in response to that, he said, listen, we got to figure out what the situation is. Then the fight got crazy again and he was pulled in a different direction. I believe he was still up by the fence because there's several people scuffling by that fence. When you said the fight got crazy, what specifically do you mean? Well, that was Mr. Coleman's testimony that he saw Jonathan with a bloody face and Jonathan said, hey, I've been jumped, like looking for help. Aubrey Coleman said to him, hey, we have to figure out what's going on here. We're still assessing. Then Aubrey Coleman's testimony was at that point the fight got crazy. Then he didn't see the defendant again until he sees the blood. Is it reasonable to assume that a bouncer who is talking to the defendant and saying we have to figure this out is going to not get involved and will allow further aggression against the defendant? Absolutely, because it happened in this case, your honor. In this case, as I said, the first punch is at 1559 and 13 seconds. That's when Roberto Amaro punches the defendant. At 1559 and 40 seconds, Aubrey Coleman and the other security guards come out into the parking lot and the fight still continues on until 1601-26. That's when the stabbing happens. The fight is still ongoing the whole time while the security's out there. They've been out there 1559 and 40 seconds. They're being out there hasn't stopped anything. They haven't stopped Jonathan from getting punched. Which came first, the statement by Mr. Coleman about we got to figure this out or the secession of the fighting? The fighting didn't stop. It's not completely clear from Mr. Coleman's testimony exactly when that happened, but based on context and what else he says, it sounds like it happened near the fence because that's where you can see Mr. Coleman near the defendant. The fighting doesn't stop after he says that at all. It keeps going on for at least another half a minute. He says that, but it doesn't stop. Coleman said after he talked to the defendant who had a bloody face, the fight got quote unquote crazy and his attention was there any other questions? I have no further questions. Thank you. Okay. Thank you. Thank you. Mr. Clerk, or pardon me, Mr. Marshall, will you please close out the proceedings? Yes, your honor. Thank you. Thank you, counsel. Thank you, your honor.